# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 16, 2007          Decided July 31, 2007

No. 06-7041

MICHAEL H. HOLLAND, AS TRUSTEE OF THE UNITED MINE
WORKERS 1992 BENEFIT PLAN, ET AL.,
APPELLANTS

v.

WILLIAMS MOUNTAIN COAL COMPANY, *D/B/A* NAOMA COAL
COMPANY, A CORPORATION, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 96cv01405)

———

*Peter Buscemi* argued the cause for appellants. With him
on the briefs were *Stanley F. Lechner*, *Charles P. Groppe*, *John
R. Mooney*, and *David W. Allen*. *Larry D. Newsome* entered an
appearance.

*Gregory B. Robertson* argued the cause for appellees. With
him on the brief were *Susan F. Wiltsie*, *Mary Lou Smith*, and
*Charles L. Woody*.

Before: ROGERS, GARLAND, and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*:  The trustees of the 1992 United Mine Workers of America Benefit Plan appeal from an order directing them to pay attorney's fees to two coal companies, Williams Mountain Coal Company and Augusta Processing, Inc. The companies incurred the fees in the course of defending themselves against a suit by the trustees to compel them to provide health benefits coverage for six retired miners.  In that underlying suit, the district court granted summary judgment in favor of the companies, and we affirmed.  *See Holland v. Williams Mountain Coal Co.*, 256 F.3d 819 (D.C. Cir. 2001). For the reasons set forth below, however, we reverse the award of attorney's fees and remand for further proceedings.

I

Congress established the 1992 United Mine Workers of America Benefit Plan (the "1992 Plan") in the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act"), 26 U.S.C. § 9701 *et seq*.  *See id.* § 9712.  The 1992 Plan was part of Congress' response to the failure of certain coal companies to pay the health benefits they had promised their miners.  *See Williams Mountain*, 256 F.3d at 821.

The primary responsibility for financing health benefits for a retired miner who is entitled to benefits under the Act falls upon the "last signatory operator," defined as "the most recent coal industry employer of such retiree," 26 U.S.C. § 9701(c)(4), as well as upon "related persons," defined to include (among other things) "a trade or business which is under common control" with the signatory operator, *id*. § 9701(c)(2)(A)(ii).  *See id*. § 9711(a), (c).  The Coal Act further provides that "[t]he term 'last signatory operator' *shall include a successor in interest* of such operator."  *Id*. § 9711(g)(1) (emphasis added); *see also id*. § 9701(c)(2)(A) (defining a "related person" to "also include a successor in interest of" a related person).  Having allocated this

responsibility, the statute leaves the term "successor in interest" undefined.[1]

In 1996, the trustees brought this action against Williams Mountain and Augusta Processing on behalf of six retired miners. *See* 29 U.S.C. § 1451(a)(1) (authorizing a plan fiduciary who is adversely affected "by the act or omission of any party" to bring an action for appropriate legal or equitable relief); *see also* 26 U.S.C. § 9721(1) (making § 1451 applicable to any claim arising out of an obligation under the Coal Act). The trustees contended that the defendant coal companies were liable for providing health benefits coverage as "successors in interest" of the last signatory operator, Toney's Branch Coal Company, which had employed the miners but had since gone bankrupt. Although the defendant companies never employed any of the six miners, after Toney's Branch withdrew from mining, the defendants successively operated the same mine where the six had worked for Toney's Branch. In operating the mine, the defendants employed other miners who had worked at the mine for Toney's Branch, as well as equipment purchased from a Toney's Branch affiliate that Toney's Branch had previously used at the mine.

In arguing that the defendant companies were liable for the retirees' health benefits coverage, the "trustees urge[d] a broad definition of successors in interest, namely the 'substantial continuity of operations test.'" *Williams Mountain*, 256 F.3d at 821. That test, which the trustees borrowed from labor and

---

[1] On December 20, 2006, Congress enacted an amendment to 26 U.S.C. § 9701 that provides a specified "safe harbor" from "successor in interest" status. Pub. L. No. 109-432, § 211(d), 120 Stat. 2922, 3023 (2006) (codified at 26 U.S.C. § 9701(c)(8)). As the amendment applies only "to transactions after the date" of enactment, *id.* § 211(e), 120 Stat. at 3023, it has no bearing on the instant case.

employment law, is "a multi-factor inquiry that examines, among other things, the ability of the predecessor to provide relief; whether the new employer had notice of potential liability; whether he uses the same plant, equipment and workforce; and whether he produces the same product." *Id.* (citing *Secretary of Labor v. Mullins*, 888 F.2d 1448, 1453-54 (D.C. Cir. 1989)). In opposition, Williams Mountain and Augusta Processing "urge[d] narrower definitions, drawn both from general corporate law and from federal tax law." *Id.* Under those definitions, a "party simply acquiring property of a firm in an arm's length transaction, and taking up its business activity, does not become the selling firm's 'successor in interest.'" *Id.* at 822.[2]

The district court rejected the trustees' broad construction of "successor in interest," found that the defendant coal companies did not qualify as successors in interest of Toney's Branch under the narrower definition, and granted summary judgment for the defendants. We affirmed. *See Williams Mountain*, 256 F.3d at 825. Although we acknowledged that "the companies may well be successors in interest to Toney's Branch" under the substantial continuity of operations standard because they "seamlessly took over operations" at the mine, *id.* at 821, we concluded that this standard should not apply to successorship under the Coal Act. The "text and structure of the [Coal Act] point firmly against successor liability based on

---

[2]Under "the standard corporate law definition[,] [i]n order to be a 'successor in interest,' a party must continue to retain the same rights as [the] original owner[,] . . . and [a] transferee is not a 'successor in interest.'" *Williams Mountain*, 256 F.3d at 821-22 (quoting BLACK'S LAW DICTIONARY 1431-32 (6th ed. 1990)). The tax law definition "shares with the corporate law definition the element of commingled ownership." *Id.* at 822 (citing 26 U.S.C. § 381; 26 C.F.R. § 1.1503-2A(c)(3)(vii)(B)).

substantial continuity of operations," we said, which distinguished the Act from the labor and employment statutes to which the standard had been applied. *Id*. at 825. Instead, we turned to corporate and tax law, and found that the defendants were "plainly not successors in interest of Toney's Branch" under either authority. *Id*. at 822.

Following our decision in their favor, the defendants filed motions in the district court requesting attorney's fees from the trustees. The court referred the matter to a magistrate judge, who recommended an award of fees. The district court ruled in accord with that recommendation, and this appeal followed.

II

Section 9721 of the Coal Act incorporates one of the fee-shifting provisions of the Employee Retirement Income Security Act (ERISA), section 4301(e), codified at 29 U.S.C. § 1451(e). *See* 26 U.S.C. § 9721. That provision states that "the court may award all or a portion of the costs and expenses [of litigation], including reasonable attorney's fees, to the prevailing party." 29 U.S.C. § 1451(e). We review for abuse of discretion a district court's decision to award such fees. *See Board of Trs. of the Hotel & Rest. Employees Local 25 v. JPR*, *Inc.*, 136 F.3d 794, 798 (D.C. Cir. 1998).

In considering the defendants' request for attorney's fees, the district court began with the five-factor test that we employed in *Eddy v. Colonial Life Ins. Co. of Am.*, 59 F.3d 201 (D.C. Cir. 1995), to determine whether to award attorney's fees under another fee-shifting provision of ERISA, 29 U.S.C. § 1132(g)(1).[3] The *Eddy* factors are:

---

[3]As the trustees correctly point out, we have never expressly ruled that the *Eddy* factors apply to § 1451(e). In *Grand Union Co. v. Food*

> (1) the losing party's culpability or bad faith; (2) the losing party's ability to satisfy a fee award; (3) the deterrent effect of such an award; (4) the value of the victory to plan participants and beneficiaries, and the significance of the legal issue involved; and (5) the relative merits of the parties' positions.

*Eddy*, 59 F.3d at 206; *see id*. (noting that the factors are "neither exclusive nor quantitative, thereby affording leeway to the district courts to evaluate and augment them on a case-by-case basis").  In the end, however, the district court determined that the "*only* question . . . is whether Plaintiffs' position, and their decision to press on with their arguments in support of that position, were so devoid of merit as to rise to the level of bad faith."  *Holland v. Williams Mountain Coal Co.*, No. 96-1405, Mem. Op. at 6 (D.D.C. May 24, 2004) (emphasis added).  Finding "this to be the case," the court pretermitted examination of any other factors and awarded the defendants attorney's fees.  *Id*. at 10.  Accordingly, we turn to an examination of the four reasons the court and the defendants offer for finding the trustees' position "so devoid of merit as to rise to the level of bad faith."  *Id*. at 6.

1.  We begin with the defendants' claim that the trustees "pursued an action . . . on a legal theory at odds with prevailing law."  Appellees' Br. 13.  The district court did not rely on this argument -- and correctly so.  When this lawsuit was initiated in 1996, there was no "prevailing law" regarding the meaning of "successor in interest" as it appears in the Coal Act.  At that

---

*Employers Labor Relations Ass'n*, 808 F.2d 66, 71-72 (D.C. Cir. 1987), the court assumed without deciding that factors like those identified in *Eddy* applied to § 1451(e).  We need go no further than that to resolve their appeal.

time, neither this circuit nor any circuit had ruled on the question.

It is true, as the defendants note, that a West Virginia district court, reviewing a bankruptcy court proceeding, had ruled on the issue. *See UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co.*, 201 B.R. 163 (S.D. W. Va. 1996). The West Virginia court, applying a definition of "successors in interest" found in Internal Revenue Service regulations, held that "purchasers of assets in bankruptcy cannot be 'successors in interest' because . . . they do not inherit the tax attributes of their predecessors." *Id.* at 171. That ruling was on appeal when the trustees filed their complaint, and was later affirmed on grounds unrelated to the definition of "successor in interest." *See In re Leckie Smokeless Coal Co.*, 99 F.3d 573 (4th Cir. 1996).[4]

It is also true that, *after* our own district court issued its judgment, and while the case was pending on appeal to this court, the United States Court of Appeals for the Sixth Circuit reached a decision in accord with that of the West Virginia district court. *See Holland v. New Era Coal Co.*, 179 F.3d 397, 403 (6th Cir. 1999). On appeal, we cited the Sixth Circuit's conclusion in reaching our own. *See Williams Mountain*, 256 F.3d at 822.

---

[4]The Fourth Circuit stated: "The courts below determined that the purchasers of Appellees' assets would not be Appellees' successors in interest within the meaning of the [Coal] Act. We need not and do not now resolve the matter, having concluded that, even if [the purchasers were] successor[s] in interest, the Bankruptcy Court may extinguish Coal Act successor liability." *Leckie Smokeless Coal Co.*, 99 F.3d at 585.

But these cases cannot alone support a charge that the trustees acted in bad faith. Decisions of the Southern District of West Virginia and of the Sixth Circuit do not bind this court. Such decisions may, of course, influence our own decisions because of their persuasive force -- as indeed happened here -- but the fact that another jurisdiction has rejected a legal theory does not render it so devoid of merit as to make reliance on it an exercise in bad faith. It is hardly unusual for courts of appeals, including this court of appeals, to disagree with their sister circuits. To the contrary, such circuit splits are an important font of the Supreme Court's workload.

2. In the view of the district court, the trustees' suit was devoid of merit because it was without "factual predicate." Mem. Op. at 7. According to the court, there was no factual basis for the trustees' contention that the defendants were successors in interest to Toney's Branch, because the defendants had no corporate ties to the latter. Moreover, the trustees assertedly knew that was so, as their own investigation had "turned up no information at all indicating [a] special relationship" between the companies. *Id*. at 7. Instead, the "only thread tying Defendants to Toney's Branch turned out to be Defendants' purchase of mining equipment from Toney's Branch, their hiring of some of Toney's Branch's former employees, and their operation of the same mine." *Id*. at 7-8. This, the court said, was insufficient.

The problem with this analysis is that it assumes the narrow corporate and tax law definitions of successors in interest. But as our opinion on the merits recognized, the very factual thread the district court discounted -- the purchase of equipment, the hiring of employees, and the operation of the same mine -- might well have made the defendants successors in interest of Toney's Branch under the broader, substantial continuity of operations test. *See Williams Mountain*, 256 F.3d at 821.

Although we ultimately rejected that test, we have emphasized that "a loss on the merits does not mean that legal arguments advanced in the context of our adversary system were unreasonable." *Taucher v. Brown-Hruska*, 396 F.3d 1168, 1174 (D.C. Cir. 2005) (reversing an award of attorney's fees under the Equal Access to Justice Act (EAJA)); *see Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421-22 (1978) (warning that courts must "resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation"). Hence, whether there was a reasonable factual predicate for the trustees' suit depends entirely upon whether there was a reasonable legal theory to which that predicate could be tied.

3. The district court found the trustees' legal theory meritless because it thought their broad definition of "successor in interest" was at odds with the statutory text, which appeared to assign separate meanings to "successor in interest" and "successor." Under the Coal Act, "successors in interest" are *required* to share liability with last signatory operators, *see* 26 U.S.C. § 9711(g)(1), while "successors" are *permitted* "to assume[,] by contract[,] liability for health benefits owed to retirees," *Williams Mountain*, 256 F.3d at 822; *see* 26 U.S.C. § 9711(g)(2). In its decision in the underlying lawsuit, the district court concluded that the trustees' broad definition would render the two interchangeable, and hence redundant, and therefore rejected the trustees' definition.

On appeal, we agreed. We acknowledged the trustees' argument that Coal Act § 9711(g)(1), which defines "last signatory operator" to include "successor in interest," is simply headed "Successor." *Williams Mountain*, 256 F.3d at 822. But we rejected the use of "a heading, which normally is a kind of shorthand, to justify stripping the actual text of two words, 'in

interest,'" which we thought were "obviously included deliberately." *Id.* We concluded that "[t]he natural reading is that Congress intended 'successors' in subsection (g)(2) to include a broad[er] class of persons, e.g., firms that take over mining operations from others, and are *not* liable as a matter of law, but assume liability by contract with the seller to suit the mutual convenience . . . of the contracting firms." *Id.*

This did not, however, end our analysis. While we concluded that "the text and structure of § 9711 point powerfully toward the [defendants'] position," *id.* at 823, we credited the trustees' argument "that courts have often used the substantial continuity test to determine successor liability in federal statutes (particularly those adopted for the protection of employees), even when those statutes include no language directly supporting liability for successors of any kind," *id.* at 824. And as we further noted, "statutory interpretation proceeds on the assumption that Congress's choice of words reflects a familiarity with judicial treatment of comparable language." *Id.* (citing *Traynor v. Turnage*, 485 U.S. 535, 545-46 (1988)). Because we could "[]not say, without some consideration of the cases using substantial continuity, that the trustees' claim [was] *a priori* wrong," we proceeded to a review of the origins of that test. *Id.* at 824. In short, before we could determine whether there was merit to the trustees' reliance on the substantial continuity test, we thought it necessary to examine the circumstances in which the test had previously been applied. We must do the same here.

Our previous opinion's review of the "origins of the substantial continuity test" began by noting that, under "the traditional rule on corporate successorship liability, a corporation that acquires manufacturing assets from another corporation does not thereby assume the liabilities of the seller." *Id.* We observed, however, that in tort cases, although the majority of courts still follow the traditional rule, "*some* courts

have" employed "the substantial continuity of operations test advocated by the trustees" in order to protect plaintiffs. *Id*. at 825 (emphasis added). Moreover, we further noted that, in "the context of federal statutes whose primary beneficiaries are employees," it "appears that *most* courts invoke the substantial continuity test." *Id*. at 825 (emphasis added).

"This departure from the traditional rule," we said, "was sparked by four Supreme Court cases, two involving disputes under the National Labor Relations Act ('NLRA') and two the Labor Management Relations Act ('LMRA')." *Id.* (citations omitted).[5] This circuit, we recognized, has followed those cases in applying the substantial continuity test to the NLRA. *See id*. at 826 (citing *Harter Tomato Prods. Co. v. NLRB*, 133 F.3d 934, 936-37 (D.C. Cir. 1998)). In addition, "[a]lthough the four cases concerned the core labor relations statutes," we found that "the reasoning has been used to find broad successor liability under other statutes that govern employees' rights whether they explicitly address successor liability or not." *Id*. at 825.[6] This circuit has followed that path as well. *See id*. at 821 (citing *Secretary of Labor v. Mullins*, 888 F.2d 1448, 1453-54 (D.C. Cir. 1989), in which we applied the substantial continuity test to the Mine Safety and Health Act).

---

[5]*See Howard Johnson Co. v. Detroit Local Joint Executive Bd., Hotel & Rest. Employees & Bartenders Int'l Union*, 417 U.S. 249 (1974); *Golden State Bottling Co. v. NLRB*, 414 U.S. 168 (1973); *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272 (1972); *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964).

[6]*See Williams Mountain*, 256 F.3d at 825-26 (citing cases from numerous circuits finding broad successor liability under the Vietnam Era Veterans' Readjustment Assistance Act, the Family Medical Leave Act, Title VII, the Civil Rights Act of 1866, and the Age Discrimination in Employment Act).

In the final analysis, we concluded that the large number of cases that have employed the substantial continuity test were distinguishable because "the text and structure" of the statutes at issue in those cases did not "point firmly against successor liability based on substantial continuity" as they did in the Coal Act. *Id.* at 825. But given how often that test has been applied to analogous statutes in both this and other circuits, we cannot say that it was an act of bad faith for the trustees to urge its application to the Coal Act. We certainly cannot say so in a case of first impression not only in this circuit, but in virtually every other jurisdiction as well.

4. Finally, the district court's determination relied in part on the fact that, while the trustees sued Williams Mountain and Augusta Processing, they failed to sue Imperial Leasing Company -- another coal company that, unlike the defendants, was owned by the same individuals who owned Toney's Branch. This common ownership, the district court held, made Imperial Leasing "a far more appropriate defendant" and the suit against Williams Mountain and Augusta Processing "untenable." Mem. Op. at 7.

But the Coal Act does not limit a plaintiff to a suit against the "more appropriate defendant." It is true, as the defendants point out, that the purpose of the Act was "to assign the duty of paying premiums 'to persons *most responsible* for plan liabilities.'" *Williams Mountain*, 256 F.3d at 823 (emphasis added) (quoting 26 U.S.C. § 9701 note). But as the statutory text indicates, Congress determined that "the persons most responsible" were the last signatory operators, related persons, and successors in interest, and it made them all "jointly and severally liable." *See* 26 U.S.C. § 9711(c), (g)(1). This means that the trustees were free to sue any party who reasonably fell within those categories, and that they were likewise free to sue some potential defendants and to settle with others. (In fact, the

trustees ultimately did settle with Imperial Leasing. *See* Appellants' Br. 30.) Because we have concluded that it was reasonable for the trustees to regard Williams Mountain and Augusta Processing as successors in interest, their decision not to sue Imperial Leasing cannot be taken as an indicator of bad faith.

## III

The district court's conclusion that the trustees' legal theory was completely without merit was no doubt due in part to the language of our own prior decision. Like other judges, we too aspire to write opinions like those that Judge Friendly said Justice Brandeis wrote: opinions in which "'the right doctrine emerges in heavenly glory and the wrong view is consigned to the lower circle of hell.'" *Taucher*, 396 F.3d at 1173-74 (citing HENRY J. FRIENDLY, *Mr. Justice Brandeis -- The Quest for Reason*, *in* BENCHMARKS 291, 294 (1967)). But as we have previously cautioned, although one panel may characterize a litigant's position as "patently erroneous," another panel equally unpersuaded by the same argument may use words like "unsupported," "unconvincing," or "without merit." *Halverson v. Slater*, 206 F.3d 1205, 1212 (D.C. Cir. 2000) (internal quotation marks omitted). And yet, neither may intend to suggest that the argument in question was not "substantially justified." *Id*. (applying a provision of the EAJA that denies attorney's fees to a prevailing party if the position of the United States was "substantially justified").

In our previous opinion in this case, we did say that there is "'no warrant whatever for broad successor liability'" under the Coal Act. Mem. Op. at 10 (quoting *Williams Mountain*, 256 F.3d at 826). But as noted above, before reaching that conclusion, we also declared that "we cannot say, without some consideration of the cases using substantial continuity, that the

trustees' claim is *a priori* wrong." *Williams Mountain*, 256 F.3d at 824. That is not the language we typically use to mark a claim as devoid of merit.

Nor could we have done so here. As we have discussed, this was a case of first impression, in which the trustees urged upon us a test that "most courts invoke" in "the context of federal statutes whose primary beneficiaries are employees." *Id.* at 825. The Coal Act is such a statute. Hence, this was not a case the plaintiffs "lost because [they] vainly pressed a position flatly at odds with the controlling case law," but rather one they "lost because an unsettled question" as to which they had a reasonable position "was resolved unfavorably." *Taucher*, 396 F.3d at 1174 (internal quotation marks and citation omitted).

Because the district court made clear that it rested its decision to award attorney's fees solely upon its determination that the trustees brought their underlying suit in bad faith, we need not belabor our discussion with an examination of the other *Eddy* factors. As both parties agreed at oral argument, a determination that the court erred in finding the suit so meritless as to have been brought in bad faith requires us to reverse the award as an abuse of discretion. *See* Oral Arg. Recording at 11:50, 29:59. Moreover, where as here the issuance of an award requires the exercise of a district court's discretion, and where we disagree with the ground upon which the district court relied, our usual course is to reverse and to remand the case to that court for further proceedings. Accordingly, the judgment of the district court is

*Reversed and remanded.*